### J. L. Henry, Defendant in Error, v. Warren C. Darnall et al., Defendants.   Warren C. Darnall, Plaintiff in Error.

### Gen. No. 8,064.

1. PARTNERSHIP—*co-ownership of selling rights as element.*   One associated with a real estate broker in the sale of land, which selling right the broker has acquired by contract with a syndicate, is not a co-owner of the selling right with the broker within the statutory definition of a partnership, where it does not appear that the syndicate consented to any transfer of the broker's selling right to the associate.

2. PARTNERSHIP—*basic elements.*   The foundation principle of a partnership is the condition of co-ownership in the right to a profit and the sharing of such profits and that each acts as principal and agent for the other.

3. PARTNERSHIP—*intent as decisive of*.  Whether a partnership exists is determined by the parties' intention, and that can only be shown by an express agreement or by facts and circumstances from which the intent to form a partnership can be implied.

4. PARTNERSHIP—*evidence that selling agent of realty broker was not a partner*.  A realty broker cannot be held to have formed a partnership with his agent on evidence showing that the broker bore all the expenses and paid the agent a fixed amount on all the latter's sales; that the agent took a fee for getting the broker a loan; that the agent acted under the broker's orders; and that the agent never owned any share in the right to sell the lands dealt in.

Error by defendant to the Circuit Court of McLean county; the Hon. FRANK LINDLEY, Judge, presiding.  Heard in this court at the April term, 1927.  Reversed and remanded with directions.  Opinion filed October 31, 1927.

SIGMUND LIVINGSTON and W. W. WHITMORE, for plaintiff in error.

WILLIAM R. BACH, for defendant in error.

MR. PRESIDING JUSTICE SHURTLEFF delivered the opinion of the court.

Plaintiff in error, one of the defendants in, the court below, has brought the record in this suit to this court, by writ of error, seeking to reverse the decree of the circuit court of McLean county, finding and decreeing that a partnership existed between plaintiff in error and defendant in error, and upon an accounting had, the decree finds in favor of defendant in error in the sum of $7,784.80, part of which it was ordered should be paid in cash, and a part should be distributed upon the sale and disposition of certain notes and securities now in the hands of William W. Whitmore, by stipulation of parties, he being one of the solicitors for the plaintiff in error, no receiver having been appointed.  We shall denominate the parties as complainant and defendants.  There were others made parties defendant to the bill of complaint in addition

to plaintiff in error, as having or claiming to have some interest in the said notes and securities.

Complainant filed his bill of complaint against defendant Warren C. Darnall for an accounting. The bill charges that in June, 1919, complainant entered into a special copartnership with defendant Warren C. Darnall for the purpose of carrying on a real estate and brokerage business in Bloomington; that both parties agreed to contribute their entire time to said business, other than such as was required by both parties to look after and attend to their individual properties, and that each was to receive one-half of the net profits of such business; that the business was commenced in June, 1919, and continued until September 1, 1921, when the copartnership was dissolved.

It was further alleged in the bill that defendant Darnall had taken possession of the books of account of said firm and had collected a large amount of money upon certain promissory notes and refused to account for said partnership moneys. Defendant Darnall filed his answer, in which he specifically denied that he entered into partnership relation with the complainant for the purpose of carrying on a general real estate business or any other business. The answer further specifically denied each and all of the allegations of the bill, in so far as such allegations tended to charge a partnership relation, and the answer averred that the only business relation or connection defendant had with the complainant was, that for about two years defendant sub-rented office accommodations to complainant where they carried on their business affairs as real estate brokers independently, with the understanding that they would mutually assist each other, working up and making real estate sales for brokerage; and in deals of that kind in which they jointly participated, brokerage should be divided equally between them, after deducting the necessary expenses,

Henry v. Darnall, 246 Ill. App. 250.

with the positive understanding that such deals were independent joint enterprises and not a copartnership.

The answer further averred that during their office association defendant would frequently permit complainant to participate and share in the brokerage where sales were made, and that in each case just as soon as the transaction was closed and the commission collected, defendant paid to the complainant his share of the brokerage, except in such instances where defendant had advanced money to the complainant equal to or in excess of the amount of his share of said brokerage; that each transaction was a separate undertaking and not a copartnership; that it was so understood by both parties; that such was the basis of several settlements and adjustments of accounts between them, and that said complainant never claimed any partnership relation, nor demanded a partnership accounting at such settlements. The answer averred that the method of settlement employed was that defendant furnished a statement of the deals in which complainant participated and the amount of brokerage collected, and that settlements were made thereon and accepted and acquiesced in by complainant without objection, and without any claim that there was a partnership.

The answer further states that defendant verily believed that he had overpaid complainant for all joint deals or ventures in which they had participated together.

It was further averred that the question of the business relation between them came up on two particular occasions, when it was necessary for them to file income tax schedules to the United States Government, and that both said complainant and defendant, upon due conference and advice, declined to file partnership schedules of income, each then contending

that there was in fact no partnership between them and, therefore, they filed no partnership schedule.

It is further averred in the answer that in their office association all business was transacted in their individual names, and that they had no joint letterheads, no partnership bank account, no firm books of account, and that each operated independently of the other, except as the defendant would permit the complainant to participate in individual deals, and that it was understood between them that each was to attend to his personal business, and that there never was any agreement between them as to what time either should contribute to the business deals in which both happened to be interested. The answer denied that defendant was in the possession of any money, funds, securities or property, as charged in the bill, in which the complainant had any interest. Replication was filed and the cause referred to a special master and proofs taken. The master made a report, to which objections were filed, overruled, and the same were made exceptions before the chancellor. One of the objections made and overruled was that there had been no interlocutory decree upon the contested issue as to the existence of a partnership, as alleged in the bill. The chancellor sustained the exception to the overruling of this objection, entered an interlocutory decree, finding that a partnership existed, and rereferred the cause to the special master to take further proofs as to the accounting. No issue is made by the answer or proofs made and offered by the other defendants, none of whom except to the decree requiring attention in this court.

The master, after hearing further proofs from both parties, again made his report, to which defendant filed objections, which were overruled by the special master, who filed his report in court, where the objections were ordered to stand as exceptions. The matter was then heard before the chancellor, who, upon

Henry v. Darnall, 246 Ill. App. 250.

hearing exceptions to the master's report, sustained many objections and overruled others, but the objections that were sustained and those that were overruled were not specified by the chancellor and are not noted in the decree.

In disposing of the exceptions to the master's second report, the decree merely states that, "all exceptions of either the complainant or defendant Darnall to the Master's report and which are in harmony with this decree, and the findings, are sustained, and all exceptions of either of said parties which are contrary to and are not in harmony with this decree and the findings are overruled."

In the decree the court charges several items which were not contained in the master's report and eliminates several items which were in the master's report. The decree finds that defendant should be charged in the accounting for the following:

"$10.00 per acre commission, sale of 336.55
   acres ...................................$3,365.00
$50.00 per acre on 119 acres .............. 5,950.00
$10.00 per acre on 188.75 acres ........... 1,887.50
Collected of Scott ....................... 4,207.21
Collected of Bronson ..................... 1,180.79
To amount of money spent by Henry ......   875.00
To cash received from Warnsing ..........   106.88
To commission collected by Darnall on Mc-
   Kenzie deal .........................   350.00
                                          _____
                                          $17,922.88"

The decree credits defendant with the following items:
"By Darnall, expense of office ............$  798.50
By automobile expense ....................   254.79
By Darnall expense of trips .............. 1,020.00
                                          _____
   Total .............................$2,073.29"

Decree finds the balance, $15,849.59, the net with which defendant is charged, belongs to said partner-

ship; that one-half of the same, namely, $7,924.80, less $140.00, complainant owes to defendant, or that $7,784.80 is due to complainant from said defendant.

The decree then makes further direction as to the notes and securities in the hands of William W. Whitmore, who was not a party to this suit, and orders certain of the moneys to be distributed and a sale of the notes and securities to be held by said Whitmore, at which sale complainant and defendant may bid.

To better understand this case and the nature of the major items allowed in complainant's behalf, a brief statement of the transactions out of which they grew is of interest and sheds some light upon the nature of the relationship between complainant and defendant.

Defendant was an agent under contract with the Lee Land Company of Texas to represent it exclusively in the State of Illinois, in negotiating the sale of Texas lands, located in the Rio Grande Valley. Under this contract defendant was required to open and maintain an office in Bloomington. By a subsequent agreement, the Lee Land Company agreed to bear one-half of the expense of equipping and maintaining the Bloomington office. Pursuant to this contract, defendant opened an office in the Illinois Hotel building in Bloomington, and in organizing his sales force, associated with him two men, Henry G. Burgess and George A. Egan. The latter at first was employed as a bookkeeper and stenographer at the salary of one hundred dollars per month. Later on, an arrangement was made with Egan whereby he participated in the commissions and bore a pro rata share of the office expenses in lieu of his monthly salary. The arrangement was that defendant, Burgess and Egan, commencing February 1, 1918, began dividing the expenses and commissions among them on the basis of 40,

30 and 30.  Burgess withdrew and defendant and Egan continued operating together upon the basis of a fifty-five and forty-five per cent division of office expenses and commissions.  In due course of time defendant and Lee, of the Lee Land Company, interested a group of men at Petersburg, in this State to go to Texas and inspect a three hundred acre tract of land which the Lee Land Company had for sale.  For some reason defendant was unable to accompany the prospective purchasers on the trip and communicated that fact to Lee, who advised defendant that if he would send Egan down with the Petersburg parties he (Lee) would do everything he could to sell them the land on his contract, the same as if defendant were there.  After inspecting the three hundred acre tract, the Petersburg men returned to Illinois and conceived the idea of organizing a syndicate to purchase a larger tract of land, known as the "Hill" tract, consisting of 1122 acres.  Defendant learned of this movement from Egan, who had accompanied the party to Texas.  Defendant went to Petersburg to see the parties who had been to Texas, and was invited by them to become a member of the syndicate which was considering the purchase of the "Hill" tract.  As a result of defendant's and Lee's efforts, aided by the Petersburg men, a syndicate was organized, and this group, with the exception of three men who were represented by other members of the group, again went to Texas with defendant and Lee and closed the deal with the Masterson Irrigation Company for the purchase of the "Hill" tract.  Defendant became a member of the syndicate to the extent of one-tenth interest, and also carried an additional one-twentieth interest in his name for the Lee Land Company.  After the closing of this contract, defendant was later employed by the syndicate to manage the sale of the land thus acquired, defendant to receive ten dollars per acre from the syndicate for superintending sales.  In the

meantime, defendant invited complainant to join his forces to assist in selling this land, first requesting complainant and his wife to go with him, at defendant's expense, to inspect the Texas land. This they did and upon his return complainant agreed to assist in the sale of the land, and the three of them, defendant, Egan and complainant, were to divide equally the ten dollars per acre commission to be paid by the syndicate for such sale. By reason of complainant becoming interested in the sale of the Texas land, defendant agreed that he should share in the "Hill" tract commissions, when collected.

In the sale of the "Hill" tract to the Petersburg Syndicate, it was claimed by the complainant in the proofs that the tract was figured in to the members of the syndicate at about $164 per acre, to be paid for by members of the syndicate, one-third in cash, one-third in "A" vendor's lien notes, and one-third in "B" vendor's lien notes, and that all of the shareholders, except defendant, made the cash payments and executed the notes, which were shown by the proofs to be good and collectible.

Complainant offered proofs tending to show that defendants and Lee were charged only one hundred twenty dollars per acre for the land, and were not required to make any cash payment, but that, after the sale was completed through the Lee Land Company, there was turned over to defendant $1750 in cash and an order upon the Masterson Irrigation Company, which was accepted by that company for vendor's notes amounting to the sum of $23,000, as defendant's commission for procuring purchasers to buy the Hill tract. This order and payment of the cash to defendant was made at about the time or shortly after Egan severed his connection with defendant, and complainant claims to have joined with defendant on a "fifty-fifty" basis. Later, various methods were resorted to to make sale of the "Hill" tract. A price

of $225 per acre was placed upon the lands, subjected to defendant's commission of $10 per acre, and agents were given all they could obtain above that price for the lands.   One Scott made a number of sales for a considerable acreage, but not having the funds to finance the advance or cash payments, defendant was compelled to and did advance moneys to the amount of nine or ten thousand dollars to complete the Scott sales.  It was charged, and testimony was offered tending to prove that defendant received $50 per acre for all such lands sold by Scott, which defendant was required to finance, complainant claiming that the $50 per acre was a commission to defendant for the sale of the land, and defendant insisting that such charge was a concession to defendant for financing the deal, without which the sale of the lands would have been lost and the commission of $10 per acre to complainant and defendant unearned.   In some of the sales Scott had a profit as high as $200 per acre above the syndicate selling price.   The attempt on the part of the Petersburg Syndicate to sell the lands was a failure, and all the members except the defendant and the Lee Land Company met with severe losses.   In the end a settlement was effected between the members of the Petersburg Syndicate, defendant, the Lee Land Company, or by one Stewart of the American Land Company, which had absorbed the Lee Land Company, and the Masterson Irrigation Company, by which the unsold lands were returned to the Irrigation Company and defendant returned the order which had been accepted for vendor's lien notes, and received in return therefor two notes for five thousand dollars each, executed by one Warnsing, a member of the Petersburg Syndicate, which were paid in addition to eight hundred dollars interest on said notes, which defendant insists was all the commissions he received upon the sale of the "Hill" tract; and defendant also insists that said sum and settlement includes other

commissions and payment for services performed by defendant for the Lee Land Company.

We have attempted only a meager detail of one of the transactions growing out of the claimed partnership. There may be minor errors in this statement. It is not important. In the view we take of this case a review of each item in the accounting is not necessary.

Complainant contends, upon the establishment of the partnership, that defendant concealed the fact that he was charged only $120 per acre for the "Hill" tract and was not required to make the one-third cash payment for the lands to the irrigation company, and that the vendor's lien notes, signed by the members of the Petersburg Syndicate, being good and collectible paper, that defendant is therefore chargeable with profits belonging to the partnership in the sum of $1,750, cash paid, and the further sum of $23,000 for the vendor's lien notes, by the accepted order. And the complainant further contends that defendant, having in his hands assets belonging to said partnership, had no right to release them, or waive them to the Petersburg Syndicate, or to any other person, and that, in reality, all of the funds advanced by defendant to Scott to finance his deals or for any other purpose, being partnership funds, complainant is entitled to share in the profits of said funds. The chancellor apparently took that view of the case, although he did not allow the order for vendor's lien notes in the sum of $23,000 as a profit, for which complainant has filed an assignment of cross errors.

It becomes important first to consider whether the testimony presented in this case establishes a partnership. Before proceeding to that subject, it may be well to suggest that the four major items, amounting to over $1,500, grow out of profits and commissions connected with the "Hill" tract deal, and that on April 25, 1920, in consideration of the payment of the

sum of $1,575 by the defendant to complainant, the complainant signed and delivered to the defendant his written receipt and acquittance: " 'In full settlement of my share of commissions in the sale of the Hill' tract at Harlingen, Texas, to the Petersburg Syndicate in 1918." But the complainant contends that he should not be bound by this acquittance on account of the fraud and deceit of the defendant in concealing the fact that said lands were purchased from the Irrigation Company by the Lee Land Company and defendant at a price of $120 per acre and sold to the Petersburg Syndicate at a price of about one hundred sixty-four dollars per acre. Complainant further charges fraud in that defendant concealed the fact that he had received a commission or an order for commissions in the sum of $24,750 on the sale of the "Hill" tract, and therefore complainant should not be bound by his settlement, and that he should be permitted to repudiate, and that complainant did repudiate said settlement. In these contentions complainant is not borne out, either in the law or by the fact. Complainant in his bill nowhere charges fraud or deceit, nor makes any claim but that said settlement was made freely and voluntarily and for a full consideration. And upon the facts it is shown in the record, over the signatures of complainant and Egan, that upon April 17, 1919, the defendant showed said complainant and Egan the original document of the following instrument:

"Warren C. Darnall, Esq.        Ho. June 23rd 1918.
        "City
"Dear Sir:—

"On consummation of sale to the parties signing contract of purchase yesterday of the Hill Plantation property near Harlingen so as to net me $120 per acre on Mr. Lee's order I will pay you $1750 in cash and approximately $23,000.00 in second lien notes.

Yours truly,
(Signed) H. Masterson."

This was shown to complainant and Egan at about the time defendant was making a settlement with Egan over the same subject matter about which settlement complainant was fully advised and consulted with, and with the terms of which he was in full accord. In fact, complainant reduced the amount of his commission so that Egan could get more. Defendant represented to complainant and Egan that his total commission for the sale of the "Hill" tract did not exceed six thousand dollars.

We have gone at length into the details of the "Hill" tract transaction, not for the purpose of determining the merits of the controversy as to the item, but to show its bearing upon the question of a partnership. There were several of such transactions, none so large as the Hill transaction, but each was settled, if it was settled, separately and independently of any other transaction, and proofs were presented tending to show that complainant received about nine or ten thousand dollars in commissions from defendant during the period they operated together. Likewise, commissions were paid by complainant to defendant in lessor amounts on transactions that originated with complainant or were of his own securing. Each transaction was settled or adjusted in most cases at the conclusion of the same.

Complainant called defendant to the stand as the first witness in the case to testify to all conversations and business relations with the complainant. As to the conversations and the terms of the relationship, defendant's testimony substantially agrees with the complainant's testimony. Complainant testified—and we subjoin substantially all of complainant's testimony bearing upon the terms of the contract:

"I met him on the street and he wanted me to come over there and get interested in the Texas land proposition * * *.

"Darnall wanted to know what I thought of the proposition. I asked him what his proposition was. He said Burgess was in the office and Egan for a short time. He said, We have been working thirty-thirty and forty per cent.  *  *  *  I told him I didn't want to go in unless he would operate three ways. *  *  *  I told him provided it was satisfactory with Egan to divide on three way proposition to split the expenses three ways and the commission three ways. About three days later I  *  *  *  asked Darnall if he had talked the matter over with Egan, and he said, 'it is perfectly satisfactory with George (Egan) for you to come over, and we will divide three ways.' *  *  *

"Under that arrangement I went over to Darnall's office the 20th to the 25th of April, 1918.

"Darnall told me about having 320 acres (Texas land) on commission. Egan, Darnall and I continued together dividing our profits  *  *  *  three ways, until the first of June, 1919. The office did not make expenses during that time.  *  *  *

"That arrangement between us continued from the time I went into the office until June, 1919. We couldn't arrive at a settlement on the 'B' notes on the Hill Tract (a Texas land sale). Egan was insisting that we get some kind of an arrangement, and it seems as though we couldn't. The office was not exactly satisfactory. Darnall was going to change and he did.  *  *  *  He withdrew from the office and moved to the People's Bank building and Egan moved his stuff home. Egan wanted me to continue and keep the office and Darnall wanted me to go to the People's Bank Building with him. Finally I went with Darnall. Darnall was going to get the sale of the Petersburg land or the Hill Tract and there would be $10 an acre commission in it at $225 an acre. If I would go with him the $10.00 was to be divided fifty-fifty, same

as everything else. We went over there on the basis of each paying one-half of the expense. * * *

"I said I would go on the basis of fifty-fifty divide. * * *

"We each had our own interests and we were not going to buy any land. If we did anything it would have to be by special arrangements. Shortly after we went there we did buy an option from J. M. Duff on the Ross land. * * * I did not know or have anything to do with buying the Clarke land which Darnall testified about in this case. * * * The only thing I know he talked to me about it and told me that they were in bad up there and being a niece of his he had to help them out and he went up there and took the land over and after about 30 days he came to me one morning and asked me if I knew where I could get him a couple of thousand dollars. I asked on what, and he said, 'Personal.' I said if the security is all right, yes. He told me what he had and I said I could get it for him and in ten minutes he gave me a check for $25. He said he would give me $25 if I would find $2,000 until in the fall. I had nothing to do with Clarke deal only in that way. * * *

"Scott sold something over 200 acres before the arrangement was made whereby we were being paid $50 an acre to close the deals he had made. We got $10 per acre from those sales but there was something else there. Scott had some money advanced and that is why that $10 an acre was added to it on account of the money that had been advanced by Darnall to make these trips and he had taken notes that Scott had taken and if there was any loss in them I was to stand my part and Darnall was going to put up the money.* * *

"Darnall and I quit working together on the fifty-fifty split of expenses and commissions along in February 1921. I stayed at the office there after that,

"After February, 1921, we were dividing office expenses and any deals that came up. We would decide how to divide the commissions, before the deal was made. That arrangement lasted from February until September."

Complainant further testified upon cross-examination:

"I don't know whether you call it a partnership. We had that agreement, we were dividing three ways.

"That agreement was made in April 1918. It is not in writing. The substance of it was we were to divide our commissions and divide our office expense.

"We were to divide our office expense and divide our commissions three ways, that was all. No other expenses were to be divided, we only had office expense. We wasn't dividing any on the outside. * * * That was the understanding, no other expenses were divided except office expense. No other profits were divided except commissions; that is all. It wasn't a division of losses and profits, it was limited to certain deals.

"Our agreement was that we would go to work and divide expenses, any deal that came up there would be certain expenses. The contract wasn't written. I told him that we would split fifty-fifty. That was three ways when we made our first agreement. I said we will divide our office expense on deals and commissions. That was the substance of the whole thing. It was limited to office expense on deals. * * *

"I didn't say profit. I said commissions. I don't know anything about profit."

The testimony showed that these parties kept no partnership book of accounts. Defendant kept a set of books in his individual name and the books covered all transactions with which defendant was connected. There was no partnership sign or name, although in two or three cases checks were drawn to defendant and complainant. There were no letter heads or envelopes showing a firm name, or any other insignia of

a joint enterprise. On two different occasions, complainant and defendant discussed the question of submitting a partnership joint income tax schedule. They advised with lawyers and in one instance consulted the Federal income tax officials, and were advised by both lawyers and officials that such joint schedule was not necessary and no such schedule was filed. To some extent, at least, their relationship must be determined by the interpretation they have placed upon it.

In 1917 the Legislature passed an act entitled "An Act relating to Partnerships and to Promote Uniformity in the Law With Reference Thereto." This act substantially embodies the law, as the courts had theretofore determined it. Section six of the act, Cahill's St. ch. 106a, ¶ 6, provides: "A partnership is an association of two or more persons, to carry on *as co-owners* a business for profit." At the outset, it is pertinent to inquire if the testimony shows complainant and defendant were the "co-owners" of the business and transactions in question. A part of this business, for example, the "Hill" tract, was the right to sell the lands of the Petersburg Syndicate at a stated commission of ten dollars per acre. Defendant had such right by virtue of his contract with the syndicate. This right defendant could not transfer to complainant, nor any interest therein, so as to make complainant a co-owner, without the consent of the syndicate. There is no testimony in the record that the syndicate ever consented to any such transfer. In other words, no privity is shown to have existed between the complainant and the Petersburg Syndicate, recognizing the complainant as a *"co-owner,"* or otherwise interested in the transaction or contract. One of the vital elements of "co-ownership" is therefore lacking in the transaction mentioned, and the same principle runs to the entire business. Section seven of the act, Cahill's St. ch. 106a, ¶ 7, provides:

"The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived."

It is further provided in the act: "The receipt by a person of a share of the profits of a business is *prima facie* evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

"(b) As wages of an employee or rent to a landlord."

The above principles laid down by the statute are amply sufficient to determine the rights of the parties in this case. We would say that the foundation principles of a partnership, as laid down by the statute and the decisions of the courts, is the condition of *co-ownership* in the right to a profit and the sharing of such profits, and that each acted as a principal and agent for each other. The right to act as a principal in relation to joint property is the basis of the right to act as agent for each other. The courts have fully recognized these principles. In *Fougner v. First Nat. Bank of Chicago*, 141 Ill. 124, 129, it is held:

"In *Holman v. Hammond*, L. R. 7 Exch. 218, it is said the import of the opinions delivered in the House of Lords, in that case, are correctly summarized by O'Brien, J., in *Shaw v. Galt*, I. R. 16 C. L. 375, thus: 'The principle to be collected from them appears to be, that a partnership, even as to third parties, is not constituted by the mere fact of two or more persons participating in or being interested in the net profits of a business, but that the existence of such partnership implies also the existence of such a relation between such persons as that each of them is a principal and each an agent for the other.'

"Lord Cranworth, in his opinion in the case, (viz., of *Cox v. Hickman*,) uses this language: 'It is often

said that the test, or one of the tests, whether a person not ostensibly a partner is nevertheless in contemplation of law a partner, is whether he is entitled to participate in the profits. This, no doubt, is in general a sufficiently accurate test, for a right to participate in profits affords cogent, often conclusive, evidence that the trade in which the profits have been made was carried on in part for or on behalf of the person setting up such a claim. But the real ground of the liability is, that the trade had been carried on by persons acting on his behalf. When that is the case, he is liable on the trade obligations, and entitled to its profits or to a share of them. It is not strictly correct to say that his right to share in the profits makes him liable to the debts of the trade. The correct mode of stating the proposition is to say that the same thing which entitles him to the one makes him liable to the other, namely, the fact that the trade has been carried on in his behalf,—i. e., that he stood in the relation of principal toward the persons acting ostensibly as the traders, by whom the liabilities have been incurred, and under whose management the profits have been made.' ''

In a case very similar to the case at bar, *Reed v. Engel*, 237 Ill. 628, 631, the court held: ''Appellee's proof tended to show that he was employed by appellant to assist in the sale of land on the agreement that he was to receive one-half of the profits, after deducting necessary expenses, for any land sold to buyers brought to appellant, directly or indirectly, through his efforts. Appellant contended that he had only agreed to pay appellee one dollar per acre for such sales, with perhaps extra pay, at Engel's option, in case of a good trade being made.

''Appellant contends that the testimony of appellee proved, if anything, a partnership, and therefore the action should have been brought in equity and not in a court of law. Neither party claimed that there was a partnership in the sale of these lands. A partner-

ship is never created between parties by implication
or operation of law, apart from an express or implied
intention and agreement to constitute the relation.
(*Bushnell v. Consolidated Ice Machine Co.*, 138 Ill. 67.)
Even where the parties agree to enter into a joint en-
terprise and share in the profits, a partnership, as be-
tween themselves, does not necessarily result. The in-
tention of the parties always controls. (*Grinton v.
Strong*, 148 Ill. 587; *National Surety Co. v. Townsend
Brick Co.* 176 id. 156.) While a different rule might
prevail on this evidence as to the creditors seeking to
hold defendants as partners, it is very clear from this
record that neither appellant nor appellee intended a
partnership.''

In the end, in all cases the question of a partnership
is a question of the intention of the parties, which
must be shown by an express agreement, or by facts
and circumstances from which such intention may be
implied. The intention is not otherwise to be inferred
or implied. *Reed v. Engel, supra.*

As to all of the items and transactions for which
complainant in this suit seeks a division of profits, on
the basis of a partnership, the record is conclusive
that complainant was not acting as a principal in his
own behalf, but it does show that he acted as an agent
and subordinate to defendant. As to the ''Hill'' tract,
complainant testified to a conversation with the de-
fendant, as follows:

''We were talking and he says, 'Joe you know it
is going to be quite a lot of expense to handle this
Texas land and as I am owner and manager for owners
I will have to do a lot of going around to close up these
deals.' * * * 'It is going to be expensive, do you
realize that' and I said, 'I will make you a proposition
on that $10 an acre if you will pay all the expense I
will take $2.50 and give you $7.50' and he said 'I will
think it over until morning.' ''

This statement evidences very strongly an employ-
ment and not a partnership. If they were operating

under a partnership agreement, all expenses would have come out of the gross profits or commissions. It is further shown in complainant's testimony that he accepted a twenty-five dollar fee for procuring defendant a two thousand dollar loan, at a time when, as complainant now claims, defendant had ample partnership funds in his hands. In no instance in this voluminous record do we find any testimony tending to show that complainant, as to the items claimed, acted upon his own initiative or independently of defendant's orders and directions; but the record is replete that the contracts and deals upon which complainant worked and out of which he seeks profits or commissions, were the personal contracts and transactions of the defendant, none of which were assigned to complainant with the knowledge or consent of the owners, and that the complainant was not a co-owner of any of said contracts or a principal in said business. Should the defendant die and complainant seek to wind up the pretended partnership with any of the land owners, the Lee Land Company or others with whom defendant had dealings, each and all could safely answer that they had had no dealings with him, and that the complainant had no interest in their affairs. It is the conclusion of this court that complainant, under the proofs, took no part in a partnership as a principal, and that a partnership is not established.

Other errors are assigned and argued, and complainant has assigned cross errors, but it would extend this opinion to too great length to undertake to set out and discuss any of them. A determination upon any of them is not necessary to a decision of the case.

For the reasons stated, the decree of the circuit court of McLean county will be reversed and the cause remanded to that court with directions to dismiss the bill for want of equity.

*Reversed and remanded with directions.*